MidlevelU v. ACI Information Group Good morning, Ms. Flanagan Good morning May I please the court? Yes This is Patricia Flanagan, Fox Wrath Trial for the appellant Newstex LLC, also known as ACI Information Group As a result of the overwhelming amount of error below, including the magistrate judge's failure to follow a congressional mandate, preclusion of an affirmative defense at trial, prejudicial jury instructions that were contrary to law, and denial of motions for judgment as a matter of law, Newstex was not afforded a fair trial on the merits of this action and seeks redress from this court. Ms. Flanagan, let me tell you, let me get straight to what concerns me, okay? I think the most substantial issue you present here is the first one that you raised in your brief. I think there's a very good argument that the Latimer test does not really govern for the determination of whether there was an implied license in this context. But even if that's right, it's not clear to me that there was substantial enough evidence here from which a jury could have reasonably inferred an implied license, so that the district court might have reached the correct judgment as a matter of law, but for the wrong reason. So I guess the thing I really would like to hear from you is, why was there enough evidence from which a jury could have reasonably inferred an implied license? And I want to say, the Moyer testimony that was not admitted might have created that issue, but you haven't challenged any evidentiary ruling along those lines, and so it seems to me in this determination we've got to look at the evidence that is actually in the record to determine whether there's an implied license or not. Or a jury could reasonably infer an implied license. Yes, Judge. So I do believe that the record supports consistent with the other circuits and with the district courts that have looked at this particular issue as it relates to search engines. Your Honor correctly notes that Latimer does not preclude the application of the implied license outside of the context of work for hire situations. And in that context, the court looks at all three of those factors to determine whether or not there is sufficient intent and a manifestation of intent on an objective basis. So here the record does support that there was in fact an objective manifestation of intent that an implied license was granted. The appellate news text, and I'll direct the court also, there were a… Tell me what evidence in the record came in at trial that supports that idea. Yes, so there was a significant amount of evidence as to exactly what the tool was. It was an electronic reference tool that the news text subscribed to the RSS feeds for scholarly blogs. By doing so, they hit a single button on the website. The website was completely set up to send out the blog content to third parties on the website. The record supports that mid-level you, in this case, set up that RSS feed to send out full text of every blog to any third party that hit the button. The record supports that there was no tracking. They have absolutely no idea where that content was being sent to. The mid-level you sent the content… But what would suggest that mid-level you would impliedly consent to a subscriber then publishing that full text for pay? Absolutely. And here, just to correct what you just said in terms of our position, the content wasn't republished. It was indexed for searching capabilities. So the abstract itself wasn't republished. It was just used for purposes of when the universities and the students were searching for the content, they would insert keywords. And that's what the abstracts were used for. So it was not republished. It was just added to the index and categorized. In this case, mid-level you set up its RSS feed. They edited code in the actual feed so that it would send out full text. And there's testimony from Chris Moyer about the actual Drupal type of software that was used. So first of all, they didn't just send out snippets, which is very common. You send out a snippet so that these feed readers… I don't know if you're familiar with a feed reader, but when you sign up for this content, it comes to your feed reader. And then you can sort it and share it and print it. There can be no dispute based upon the record that the content was authorized to be sent to these folks that received the content on the other side when they subscribed. Just like a web page on the Internet can use code to make it so that Google does not archive your web pages, the RSS feed likewise can include code that communicates with the other users on the Internet. So in this case, they specifically said any use is permitted. And the record does support that. Where is all this evidence? It is in the record, Your Honor. I believe that it is cited in our brief. Where would it have been before the jury? It would have been in Chris Moyer's testimony. But he wasn't allowed to testify, right? I'm sorry, Judge? I thought he wasn't allowed to testify about RSS feeds and all of that. He was permitted to testify from his own personal knowledge. But not any kind of customary evidence, right? He testified to what he had seen and observed. And also, the plaintiff did testify significantly about the setup of the RSS feed and the setup of the RSS feed also. He was not allowed to testify as an expert or allowed to testify about industry standards. Is that right? That's absolutely correct. The judge precluded that during the trial. So also direct the court to the parties did also have a pretrial stipulation that was read in during the proceedings. And that is also included in the record. And it does contain some of the different facts that we rely upon to show some of the things that I just said. The setup of the RSS feed, the purposes of the feed, that it was not modified after 2015, I believe. The whole purpose of setting up an RSS feed is to, it's RSS feed, it's the real simple, really simple syndication. So the whole purpose is to send your content out to as many folks as you possibly can and for them to share. The fact that they did not add any additional limitations to that feed, there was no restrictions included in that feed. I don't think that can be disputed that Newstex's receipt from mid-level U of that content was authorized. And that means we're in the context of an applied license and we have to be able to look at that defense. And at trial, Newstex was precluded from doing that here based upon those facts, which was absolutely error. And I direct the court also, I know that the district courts that had looked at specifically the implied license in the context of the internet and in particular search engines, like the product that's at issue here, looked at just these exact things and determining whether there was an objective intent for there to be a license. I would also direct the court to its decision and Peter Lederese and associates, which I think is also instructive on the interplay between the implied license and the fair use defense. And in that case, from this court, actually talks about the fact that where you have any consent, which I would say is supported by the record and the fact that there can be no dispute on the facts of this case that the receipt of the content was authorized. So really, we're looking at the scope of the license and not whether or not the license applies. So the fact that we didn't even get to the scope during trial is most definitely an error. And I would say that in terms of looking at the blend between the consent issue and the applied license does go as far. And I think the evidence is identical to the evidence that was discussed in Parker and Field Google and Parker BeYahoo, where the court decided that an implied license does in fact exist. And one of the cases went so far as to say that both an applied license and it also constituted a fair use. And a contrary decision by this court would result in not only a split of authority, but the risk of liability for search engines. It would also create, in this case, preclude other search engines and reference tools from joining the marketplace. Could you take a moment in the time you have left to discuss the failure, your claim about the failure to consult a register of copyrights? My concern, and I haven't done a deep dive into the record, but my concern from what I've read is that you did not do all of that the district court asked for in terms of requesting a consultation with the register of copyrights. You didn't put the process or the request, for example, in writing when the district court seemed to be confused or uncertain about the process. Could you tell me a little bit about that? Absolutely. The requirement in Section 411 of the Copyright Act specifically requires for the district judge to request that information from the register of copyrights. There is absolutely no requirement that we request that the judge follow that particular mandate from Congress. I would also, though, dispute, and I would direct the court to one of the cases that we cited in our brief, which does talk about the fact that you cannot waive a congressional mandate. But that day, and I think that the mid-level use brief misconstrues the trial interaction with the judge from that day. The judge had indicated at 6 o'clock that he should just call the copyright office. And of course, we said we don't think that anyone will be there at 6 at night. And so it was discussed. He said he was having his law clerk look into the issue, and we would discuss it the next day. It was not raised the next day, so it was our belief that he had figured out what the proper procedure was. Did you provide any guidance to the district court? No, we did not rediscuss the issue after that. He certainly asked for guidance here, didn't he? He asked for guidance, and then he stated after that that he was having his law clerk, and he restated what he thought. We have a question from Judge Marcus. He asked for guidance because this was an unusual obligation that the statute had placed upon him, and he really wasn't quite sure what to do. And so he said, did he not, in words or substance, what do I do here? Help me. Let me know what you think. And you came back with nothing. Is that a fair recitation of what happened? No, Judge, it's not. Tell me why not. He said exactly what you just stated, but then he continued talking, and he restated what he thought he had to do. He said, I think this is a requirement. I have to do this. I'm having my law clerk. I think I find that there's inaccurate information that's been submitted to the Copyright Office, and then if I do that, then I have to send this request to the Registrar of Copyrights. I direct the court to Unicolors, which is the case that we submitted supplemental to our brief that specifically looks at this issue. And there was no specific request by the defendant there either for this issue to be looked at. Any other questions? Thank you, Ms. Flanagan. You've saved three minutes for rebuttal. Mr. Worth. Good morning, Your Honor, Chief Justice Pryor, Justice Marcus, Justice Jordan. My name is Drew Worth, Andrew Worth, from the law firm of Wallinglands and George and Davis in Nashville. And I represent the plaintiff at Pele, mid-level U. Mr. Worth, before you start, if you could, at some point during your time, address the issue. It's a relatively small one, given the case as a whole, but the contention that we need to reverse the award of statutory damages as to the two blog posts that were not registered within three months of publication. So if at some point you could address that issue, I would appreciate it. Sure, I'll just address it right now. So the contention of NewsTech is that the evidence in the record did not support a jury finding as to those two articles. And just to step back, there were 16 articles that NewsTech put on the verdict form as having been allegedly first published more than 90 days before the date of the registration. So they agreed to that verdict form, and they repeatedly made the argument to the jury that there were 16 articles. Additionally, Mr. Moyer, when he testified, was explicitly asked, in your research, in your study of this issue, how many articles do you believe were first published more than 90 days before the date of the registration? And he responded, 16, and repeatedly said 16. So it went back to the jury with Mr. Moyer's testimony that there were 16 articles. There were 16 articles on the verdict form. There were 16 articles identified in closing argument. And NewsTech counsel explicitly said to the jury, when highlighting those 16 articles, these are the articles that we want you to award, do not award statutory damages on these articles. And so that's exactly what the jury did. And they say now, well, after the trial concluded, well, we missed two. Well, there's evidence in the record that there were 16. And moreover, the copyright, the date of registration on the copyright certificate is presumed valid. So you can challenge that validity with evidence. And the evidence in the case on the two articles was conflicted, given Mr. Moyer's testimony and NewsTech's repeated statement that there were 16 articles. Does that address your question, Justice Jordan? So you're saying that they never made the argument about those two blog posts to the jury? That's correct, Your Honor. At all? As I understand their argument, they say, well, you know, if you look at some of our evidence and you try and piece it together, you might see that for two articles, we submit that the date of registration, I'm sorry, the date of first publication was more than 90 days before the date on the registration. But they didn't argue that to the jury. And as I said, the evidence that when Mr. Moyer was explicitly asked the question, he said 16 articles. And then there were 16 articles on the verdict form that NewsTech agreed to. So NewsTech clearly put those 16 articles at issue and did not put the other two at issue. OK, thank you. So, you know, obviously NewsTech has made several arguments. It sounds like from Ms. Flanagan's presentation, the court is primarily concerned about implied license with some concern about this copyright. I think the only thing you can read into anything here is that it was my main concern. OK, thank you, Justice Breyer. So, yeah, I think we have to remember that a jury of eight. It seems to me an implied license, a license, just if you look at Black's Law Dictionary, a license would be a grant of permission to do something that would otherwise be unlawful. So, for example, you and I, you have a license to practice law. Sure. Right. If you didn't have that, it would be unlawful for you to do so. Correct. So in this context, it would be unlawful to infringe a copyright. But if you had an implied license, that is, if you had some kind of implied permission to engage in what would otherwise be an infringing use, you could do so without violating the act. So my concern is it seems to me that the Latimer test used for a work for hire situation does not cover the gamut of circumstances where an implied license could arise. And the district court seems to have been under the misapprehension that Latimer is the only test. It seems to me that you could have an implied license in other circumstances. Latimer certainly doesn't say you can't. But you may nevertheless win because I'm not sure that there was enough evidence admitted at trial from which a jury could have reasonably inferred that there was that kind of permission to engage in an infringing use. So could you help me with that? Sure. And so a couple of things on that. One, my reading of the case law of this circuit has been that the circuit court and then the district courts that have applied, that have been faced with implied license questions, including a case out of some district court from two days ago, was that Latimer is the test. Latimer is a three-pronged standard. And obviously, NewsTech could not meet that three-pronged standard. So I don't view the judge here, the district court, as having made a mistake. Does Latimer say that? Does Latimer say this is the only circumstance from which you could have an implied license? And if you can't satisfy this three-part test in all circumstances, then you don't have an implied license. It doesn't say that, does it? No, Your Honor. It doesn't explicitly say that. What I'm telling you is I think we may need to tell the district courts that's error to think that. Well, one thing I would query is whether that's something that would need to be raised under the prior precedent rule. Because I think that it is clear enough from the language of— Latimer doesn't say that that's the only way it can arise, that I'm not sure that we have a prior precedent rule problem. Okay. Well, I mean, it says an implied license arises when these three things happen. Yes, it does. In a work-for-hire situation, it arises then. It doesn't say that's the only way it can arise. I mean, the jury—I'll get to the evidentiary point in a second. I mean, the jury instructions of the circuit have been, you know, explicitly say these are the three times. And then, as we say in our brief, the comments and that sort of thing to the jury instructions say this is when an implied license arises. Jury instructions get changed all the time when the circuit court makes clear that they're based on some kind of misapprehension or they need clarification. My only point, Your Honor, is that I think the district court, based on the law of the circuit, when faced with this question, made the correct analysis. That is, the law of the circuit— Let's assume that the district court was wrong. Okay. Yep. Okay. What about the evidence here? Yeah, so— Why is the evidence insufficient for it to go to a jury? Why did the district court nevertheless make the right judgment as a matter of law? Because there's no evidence that mid-level you intended or gave any permission to NewsTek to make this use of their content. That is, taking their content, putting it through a software licensing system that the content was fed through, and then appeared on the NewsTek website in an unprofessional form that was an exact copy of the content that was in the mid-level article, and then NewsTek sold it. And not only did they do that, they gave access to their subscribers, and only their subscribers, the full text of the content. So there's no evidence that Mid-Level U ever would have given permission for that use. And all this stuff that Mrs. Flanagan was talking about in terms of, well, you know, she made her RSS feed available, and the full content was available to the RSS feed, none of that suggests anything other than this was a company that wanted to get its content out to readers in an effective and efficient way. So there was no evidence in the record to suggest that Mid-Level U ever intended or ever gave any sort of permission, implied or otherwise, for NewsTek or any company to take its content, put it behind a paywall, make it appear unprofessional, and then sell it to its subscribers. And in fact, Ms. Tolbert from Mid-Level U repeatedly testified that that would be the exact opposite of what Mid-Level U would try and do, because it would take readers who would come to Mid-Level U, and they would go to NewsTek instead. And those readers on the NewsTek website would see Mid-Level U's content presented in an unprofessional way, which would also make readers not trust the content. So for all of those reasons, and all of that testimony was irrefutable at trial, there was no testimony that pointed any other direction. There was no witness who stood up there and said, well, I'm familiar with Ms. Tolbert, I've worked with her, and she will do anything she can to get her content out there, good, bad, or indifferent, sold, not sold. So there was no dispute about any of that testimony at trial. So, yeah, I mean, like, the content was republished in any common sense meaning of the term. I mean, it was on the NewsTek website, it appeared on the website, subscribers logged in, and this notion that the SBI, the Scholarly Blog Index, and like Google, or in any way similar entities as search engines, was not supported by the evidence. The evidence showed at trial that unlike the customary search engine that most people are familiar with, on the SBI you might type in the search term that you want to search, and then the article popped up, but you stayed within the SBI ecosystem. So you didn't leave it like you would on Google and go out to the other internet universe. You stayed within the SBI. So it wasn't a typical search engine, which makes cases like Parker and Field inopposite. So I want to make sure that I also touch on this copyright register issue. And I want to make sure to, Justice Marcus, I think you had it exactly right in terms of what happened in the trial court below. That is, this issue about contacting the Copyright Office was never raised one time in a pretrial conference, in a brief, at any time. Sue Esponte, the judge, doing her conscientious job, recognized that the Section 411 deal might be an issue. And so during the trial, at the conclusion of one of the days of testimony, when there was still plenty of time to go in the trial, he asked Newstech repeatedly, what do you want me to do? He made it clear that he did not fully understand how to apply this statute. And he said, what do you want me to do? And, you know, it may have been 6 o'clock, but the only guidance Newstech ever gave to the judge was don't call the Copyright Office, you won't be able to get them on the phone. Then he did explicitly task them with going and finding and guiding him as to what they want to do. It was their counter plan. Boiling it down to the finest point. If there was error, it was invited. Absolutely. Absolutely. And there's one of two things that happened after the judge said, tell me what you want me to do. Either Newstech didn't care enough about this issue to raise it again, or they said, well, we're just going to sit on this issue and see what happens. And so one of those two things happened. And in either scenario, it shouldn't be challenged by the court for any relief. There's also nothing in Section 411 that suggests the failure to contact the Copyright Office would somehow result in some reversal of a jury verdict. Section 411, that provision is there to further test whether the registration should be thrown out. That is, if you have a finding of fraud, an intentional misstatement in a copyright registration, that registration can still be valid unless the judge, apparently with the guidance of the Copyright Office, finds that the statement was material. From my own personal edification and knowledge, can you tell me how a district court is supposed to contact the Register of Copyrights? Yeah. You send a letter, or you send an order asking for help, or you set up a phone conference at which the parties are available, or you can speak to someone in the office and put that person under oath. How does that process work, or how is it supposed to work? It's a great question, Justice Jordan. So what we see from the other cases that have dealt with this issue is it is best dealt with when one party raises the issue, and then the parties can confer on specific questions they want to address to the Copyright Office. And so it is usually done through a writing, and the questions are sent. Now, usually, it is when there's been a predicate finding of actual fraud. And here, it's important to remember that the fraud in the Copyright Office claim went back to the jury. So the jury was given the question, do you find, as to every single article, was there fraud in the Copyright Office? And the jury said no. So there was nothing to contact the Copyright Office about. And the numerous cases, including that Seventh Circuit case that's in our brief, say that's the proper procedure to follow. And that's actually the procedure that the Copyright Office has recommended. Give us a predicate finding of fraud, and then we can evaluate whether that fraud was material. And here, there was no predicate finding of fraud, so there was nothing to contact the Copyright Office about. And more saliently, or as saliently as Justice Marcus's point, any error here clearly invited by NewsTech. I see I have 10 seconds remaining, so if there are any other questions, I'm happy to answer them. Otherwise, I will thank the panel for its time and attention today. Thank you, Mr. Ward. Ms. Flanagan, you've saved three minutes for rebuttal. Thank you, Your Honor. I'll start by addressing this statement that was that NewsTech did not challenge statutory damages to the jury and that somehow we admitted that statutory damages were entitled on some of the registrations. So let me clarify that by saying that we absolutely, our position is that no statutory damages awards were permissible in this case. The plaintiff testified that she revised her blogs all of the time, did not maintain revision histories. She has absolutely no idea what she recorded with the Copyright Office in the applications. She cannot prove the publication dates, which caused a significant issue. They have to prove that it was within three months that it was registered of the publication dates. Without a revision history on the case law states that they cannot prove what the blog look like on that particular day. The presumption. Ms. Flanagan, let me ask you a question about just these two particular blogs or articles. Did NewsTech ever move for judgment as a matter of law on the availability of statutory damages for these articles prior to submitting the case to the jury? Yes, Judge, we moved on all of the articles. I believe in our judgment as a matter of law. Motion. But the claim is the well, not the claim, the argument by Mr. Worth is that only 16 or 17 were put before the jury and these two weren't part of that group. Am I mistaken in understanding what he's saying? Yes, the attorney argument did indicate that there were only 16. In fact, there were 18. But the evidence has to support the actual jury's verdict. In this case, it does not do so. The jury has an obligation to not only juxtapose the certified deposit copies, which were also not provided during trial. And with the actual alleged infringements, the jury has that duty to compare not only the different those two different items, but also to look at the publication dates. I'm going to make sure that the plaintiff is actually entitled to statutory damages. But your honors are right that that, you know, that that particular argument omitted two of the registrations. Anything else, Miss Flanagan? You got about a half a minute. Yes. I would like to just state that the argument concerning the intent of the plaintiff to not have her works distributed in a certain particular way. A lot of what he said was subjective and not objective and we have to actually look on what the objective evidence here, which is what Latimer does require in terms of an implied license. And I would refer the court to the appendix on pages 1728 and 1729. And that testimony actually talks about the robotics file that can be placed on the RSS feed to not permit people to take the full pages. I mean, if that was their restriction that they delivered. Can I ask one more question? Yes. Yes, Judge. What about the contention or argument that whatever the implied license was, it was not for Newstex to be able to garner payment from its own subscribers for the use of the content belonging to mid-level? I mean, it's one thing to argue that if they gave you the content because you were a subscriber and you put it up in a different format, maybe, but you're using it for your own financial benefit. And normally in that scenario, a licensee would ask for some royalties or contribution back. What do you say about that? Yes, well, a couple of things on that point. This is exactly what happens with Google when it archives the works and it's not being used, it's not being sold. What it's doing is being indexed so that it can help users and the access that's sold is the $199 to access the tool itself so that you can search and find that particular article. Isn't it true that Newstex subscribers would be able to get full access to the content without going to mid-level use blog by virtue of the payment that they make to Newstex? That is not accurate. The link that's provided, and there's a significant amount of support in the record for this, was an iframe. And again, there's protocols you can put on your web page to permit an iframe or not permit an iframe. So when you click on the link, it pops up and it shows a window, but you're looking through it and it's actually... But what you see is the entire content, right? You see the entire content of the article, right? You see it through the frame on mid-level use website. So it's showing you a window into their website. Without going to the website. You could go to the website if you hit the link to the website. You don't have to. You don't have to. It would throw up the frame and allow you to look into their website. Okay. I think I understand it. Do you have any other questions, Judge Jordan? No. She answered my question. Thank you. Okay. Judge Jordan, I did have just one other point in response to your question, if you'll permit me to provide it. Yes. I would just note that the case law does specifically require that any restrictions on the use of a work that's in an applied license be delivered with the work. In this case, it didn't say personal use only. It didn't have any restrictions. The copyright notice was in the top of the feed. And then the entire feed was just provided through the RSS feed without any restrictions whatsoever. Okay. Thank you, Ms. Flanagan. We understand your case. And we'll be in recess until tomorrow.